## Burley Tobacco Society v. Monroe, et al.

(Decided May 10, 1912.)

### Appeal from Pendleton Circuit Court.

1. Contracts—Construction of.—The only legitimate object of all rules of interpretation and construction of contracts is to ascertain and effectuate the intention of the parties. When that is apparent, the words must, if possible, be so understood as to give effect to the intention.

2. Construction of Contracts.—It is a familiar principle that courts, in the construction of contracts, look to the language employed, the subject matter and the surrounding circumstances. They are never shut out from the same light which the parties enjoyed when the contract was executed, and in that view they are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, to judge of the meaning of the words, and the correct application of the language to the things described.

3. Pooling Contracts.—Under the pooling contract of 1909, between the Burley Tobacco Society, the County Board of Control, and the Burley tobacco growers, which constituted and appointed the County Board of Control and the Burley Tobacco Society sole agents for the purpose of receiving, commingling, handling, warehousing, inspecting, insuring, grading, financing and selling all of the said tobacco in such manner and on such terms as said Burley Tobacco Society might prescribe pursuant to its charter and by-laws, the Burley Tobacco Society had the right to sell the pooled tobacco without the advice or approval of the County Board of Control.

4.  Pooling Contract—Right to   Equalize   Poolers.—Where  tobacco
    had been pooled under a contract, between the Burley Tobacco
    Society, the County Board of Control, and the burley tobacco
    growers, and sales had been made by the Burley Tobacco Society
    of portions of said tobacco in the open market, and for different
    prices, the Burley Tobacco Society had the right to equalize the
    poolers of different counties, so that in the final distribution each
    pooler would receive the same general price thus fixed by the
    Society on like grades of tobacco, pursuant to the terms of the
    contract, notwithstanding the sales were made  in the regular
    markets during a period of several months, and the market prices
    fluctuated daily on like grades of tobacco.

PENDLETON, BUSH & BUSH, O'REAR & WILLIAMS and JNO.
R. ALLEN for appellant.

LESLIE T. APPLEGATE, F. C. NEWMAN and E. S. CLARKE
for appellees.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

The Burley Tobacco Society is a branch of the American Society of Equity, and was incorporated in 1907 for the purpose of pooling the tobacco crop of Kentucky and portions of Ohio and Indiana, under the Act of March 21, 1906, which makes it lawful for any number of persons to combine or pool their crops of wheat, tobacco and other products, and sell the same, either in parcels or as a whole, in order or for the purpose of obtaining a greater or higher price therefor, than they might or could obtain or receive by selling said crops separately or individually. (Acts 1906, page 429.)

In effecting the purposes of the law the Burley Tobacco Society acts as agent of the growers of burley tobacco in selling their tobacco, by co-operating with the Board of Control and warehouse companies that have been organized by or in the interest of the growers of Burley tobacco, and thereby assists them in securing remunerative prices for their crops. The outline of the organization and operation of the Society is as follows: Each grower of burley tobacco who has pooled his tobacco crop for any given year thereby becomes a member of the Society for that year, and is entitled to vote in his precinct meeting of members for a delegate to represent that precinct in an election to be held at the county seat on the first Saturday in October of each year for the purpose of electing a director of the Burley Tobacco Society. The precinct delegates constitute the

members of the County Board of Control for their respective counties, and hold their offices for one year. The County Board of Control organizes by electing one of its number chairman, and also a secretary and treasurer. There are thus two boards in existence; first, the directors of the Burley Tobacco Society; and, secondly, a County Board of Control for each county. These two boards co-operate in the receiving, handling, warehousing, classification and selling of tobacco.

The relation of the two boards to each other is shown, to some extent, by section 3 of the charter of the County Board of Control which, in specifying the members of that corporation, and the nature of the business to be conducted by it, provides that its principal business is to co-operate with the Burley Tobacco Society, and to be governed by the rules and regulations of said Society. The validity of the Act of 1906, and of the pooling contracts made thereunder, was upheld by this court in Owen County Burley Tobacco Society v. Brumbach, 128 Ky., 137.

Pooling contracts were made during the years 1906 and 1907. None was made in 1908; but in 1909, the tobacco of sixty-four counties was pooled under a contract which reads as follows:

"BOOK No. 826.                          1909 CROP.

"County Pendleton, ............... Ky., .......19.....

"This contract made this day witnesseth:

"That in consideration of the benefits to be derived herefrom by the parties hereto, and that this contract is made by the undersigned and accepted by the hereinafter named Board of Control and Tobacco Society, as a mutual contract with other contracts of like import, taken, and to be taken and entered into by and with many other growers of tobacco, which are of mutual benefit to all, the undersigned growers of tobacco owning .......... acres of Burley Tobacco of the 1909 crop grown on the farm in possession of the undersigned in Pendleton County, ................ adjoining land of ........................, hereby constitute and appoint the Pendleton County Board of Control and Burley Tobacco Society, corporations under the laws of Kentucky, as sole agents for the purpose of receiving, commingling, handling, warehousing, inspecting, insuring, grading, financing and selling all of the said tobacco in

such manner and on such terms as said Burley Tobacco Society may prescribe pursuant to its charter and by-laws, and for such purpose hereby transfer and assign to and invest in said agents the title and right of possession to said tobacco pursuant to their charters and by-laws, and agree to deliver the same on demand at such point in said county as said society may designate. Provided, said tobacco shall not be sold below the general price fixed by said society on like grades of tobacco.

This pledge shall also include all tobacco grown or owned by undersigned of said year's crop, that may not be specified above.

The undersigned, by reason of this contract becomes, and is entitled to all the privileges as a member of said Tobacco Society.

The undersigned further subscribe for shares of the capital stock, to the amount equal to 10 per cent. of the gross sale of the tobacco hereby pledged, in the Burley Tobacco Company, to be incorporated, and authorize the Burley Tobacco Society to pay for said stock out of the proceeds of said tobacco when sold.

Upon our failure to fully comply with the terms and conditions of this contract, we hereby agree to pay to said Society as liquidated damages, twenty per cent. (20 per cent.) of the value of said tobacco, for the benefit of the members of said Society.

The Board of Directors of the Burley Tobacco Society are authorized to dissolve the pool as to this year's crop, if in their opinion a sufficient quantity of tobacco has not been pledged; provided such dissolution is declared on or before October 1, 1909, and this pledge shall be deposited for safe keeping in a bank in this county, selected for that purpose by said County Board of Control and the Executive Board of the Burley Tobacco Society, to await and subject to the final action of said Directors of Burley Tobacco Society.

The Solicitor has no authority to change the terms of this contract.

P. O. ....................) ...............Landlord.
P. O. ....................) ...............Landlord.
P. O. ....................) ...............Landlord.
P. O. ....................) ...............Landlord.
The Burley Tobacco Society and Pendleton County Board of Control.
By..................Solicitor.
...................Witness.　　　Pledge No. 82602.''

Twelve hundred tobacco growers of Pendleton county pooled their tobacco in 1909, aggregating 2328 hogsheads, under the above contract. Prior to the institution of this suit the Burley Tobacco Society sold 1,031 hogsheads of the Pendleton county pool, aggregating 1,129,549 pounds, for $120,752, leaving 1297 hogsheads on hand and unsold. Being unable, or deeming it inadvisable to sell under the conditions then existing, the Burley Tobacco Society did not sell all of the tobacco in the pool of 1909 at a single sale, but sold large quantities thereof on the open market, at different times, for the best prices then obtainable. These prices naturally fluctuated from day to day; but in settling with the members of the pool the Burley Tobacco Society adopted a plan to equalize all the poolers as to the price to be received for like grades of tobacco. In brief, this plan treats all pooled tobacco of a like grade, as having been sold in a single sale and for the aggregate price of all the separate sales, thereby fixing a general average price for all the tobacco of a like grade, although some of it had actually brought a different price.

On November 23, 1911, H. F. Monroe and seven other tobacco growers of Pendleton county being members of the Burley Tobacco Society, brought this action against the Burley Tobacco Society, the Pendleton County Board of Control, and the several tobacco warehouses in which the tobacco pooled with the Burley Tobacco Sciety in 1909 was stored, asking that a receiver be appointed to take charge of the tobacco so pooled in Pendleton county, and sell it for the members of the pool in Pendleton county; that a settlement be made between the society and the Pendleton County Board of Control and the poolers of that county, of all partnership affairs under the 1909 pooling contract, and for a distribution of the funds derived from the sale of the tobacco. The Pendleton County Board of Control filed its answer, which it made a cross-petition against the Burley Tobacco Society, and prayed for the same relief as that sought by the plaintiffs. An amended petition was subsequently filed, making charges of fraud in the furnishing of statements by the society, and contracts for rebates; but these charges were denied by the defendants, and were subsequently withdrawn by the plaintiffs. Under the pleadings as finally made up, the two following questions were presented to and decided by the lower court, and are now here for review, viz.:

(1) Has the Burley Tobacco Society, under its charter and by-laws, and the 1909 pooling contract, the right to sell the pooled tobacco without the advice or approval of the Pendleton County Board of Control?

(2) Has the Burley Tobacco Society, under the 1909 pooling contract, and its charter and by-laws, the right to equalize the poolers of different counties, so that in the final distribution each pooler will receive the same general price thus fixed by the society on like grades of tobacco pursuant to the terms of the contract, notwithstanding the sales were made in the regular markets during a period of several months, and the market prices fluctuated daily on like grades of tobacco?

The circuit judge answered both questions in the negative, and enjoined the Burley Tobacco Society from making further sales of the tobacco of the Pendleton county growers without the approval of the Pendleton County Board of Control, and from making any distribution of the proceeds of sales of the tobacco of the Pendleton county growers theretofore made, except to the poolers of Pendleton county. To reverse that judgment the Burley Tobacco Society prosecutes this appeal.

1. The appellees contend that under the pooling contract of 1909 above set forth, the Burley Tobacco Society can not sell the tobacco pooled by appellees without the co-operation and approval of the Pendleton County Board of Control; that when said tobacco has been so sold, the Burley Tobacco Society can distribute the proceeds of sale thereof only to those persons who pooled said tobacco with the appellant, and that said proceeds can not be used to equalize the prices of all the tobacco of all the counties included in the pool. The contracts for the pools of 1906 and 1907 constituted the Burley Tobacco Society alone as the agent of the grower for the sale of the tobacco; and they further provided that tobacco in those two pools should not be sold for less than fifteen cents per pound for an average crop. It will be noticed, however, that the pooling contract for 1909 constitutes and appoints the Pendleton County Board of Control and the Burley Tobacco Society as "sole agents for the purpose of receiving, commingling, handling, warehousing, inspecting, insuring, grading, financing and selling all of the said tobacco in such manner and on such terms as said Burley Tobacco Society may prescribe pursuant to its charter and by-laws—

provided said tobacco shall not be sold below the general price fixed by said society on like grades of tobacco.''

It is contended by appellees that the wording of the contract gives a joint power of sale to the Burley Society and the Pendleton County Board of Control, while appellant contends the joint agency is limited to the minor administrative matters of receiving and handling the tobacco, while the more important power of sale is confided solely to the Burley Tobacco Society.

For the purpose of determining the meaning and effect of the contract, and the rights and powers of the Burley Tobacco Society thereunder, it will not be improper to consider, briefly, certain portions of its charter and by-laws, in connection with the pooling contract.

Section 6 of the Burley Tobacco Society's by-laws permits the County Board of Control to pass by-laws not inconsistent with the charter or by-laws of the Burley Tobacco Society; but the record shows that the Pendleton County Board of Control has no by-laws.

Section 11 of the Society's by-laws reads as follows:

''All tobacco handled by the society shall bear its proportionate share of the general expenses of the society, such expense to be added to the minimum price.''

Under the general heading, ''Powers of the Board of Directors,'' Section 12 of its by-laws, provides:

''The Board of Directors shall exercise a general supervision over the affairs of the society and shall make all contracts for the sale or other disposition of all tobacco under its control and shall distribute the proceeds of all the sales among the persons legally entitled thereto.''

And, upon the subject of handling, grading and marketing the tobacco, Section 14 of the by-laws reads as follows:

''All tobacco pledged to this society shall be received at such places and at such times as may be designated by the County Board of Control and receipt shall be issued to the owner showing the amount delivered, its grades and its appraised value.''

This section shows that the work to be done by the County Board of Control is the arranging for the receiving, handling and appraising of grades of tobacco in each county; but Section 15 provides for the final grading and valuing of tobacco, as follows:

''The final grading and valuing of all tobacco de-.

livered shall be at the time when such tobacco is sold, and shall be agreed upon by the persons making such deliveries and agent of this society who received same in accordance with types established by the Board of Directors of this Society and in the event they can not agree, then the question is to be decided by the Board of Arbitrators from the county from which the delivery is made, the arbitrators to be appointed by the County Board of Control, and their decision shall be final and binding on all parties.''

And Section 17 of the society's by-laws furnishes the form for warehouse company charters.

Turning now to the charter of the County Board of Control, it will be found that the language used therein is practically identical with the charter provided in Section 17 above referred to, for warehouse companies— the forms for both being prescribed in the by-laws of the Burley Tobacco Society.

Section 3, however, of the charter of the Board of Control is the only one that bears upon this question, and is as follows:

"The purpose of said corporation and the nature of the business proposed to be conducted and carried on shall be principally to co-operate with the Burley Tobacco Society, and to be governed by the rules and regulations of said society; to assist the growers of Burley Tobacco to receive remunerative prices for their tobacco and to secure for them money to be advanced on their tobacco before it may be finally sold for them by said society; to secure title to their tobacco, so that the same may be stored in warehouses or other places, and that warehouse receipts may be secured thereon, that the same may be hypothecated or pledged to secure loans for money thereon to be advanced to the respective growers whose tobacco may be placed in charge of this company as hereinbefore provided, and to place such tobacco under the control of said Burley Tobacco Society for sale on such terms and conditions as may be provided by a contract between this company and such persons whose tobacco may be held by this company as herein contemplated; which contracts when executed shall be filed with the secretary of said society when required by said society or its executive committee, and to act as agents or trustees for such tobacco growers or other persons in handling and having such tobacco disposed of so as to promote the best interest of the per-

sons whose tobacco may be placed in charge of this company as aforesaid, and secure for them the best possible prices, less expenses incident to handling and disposing of such tobacco.''

Section 3 of the warehouse charter, the form of which is given in the same by-laws of the Burley Tobacco Society where the form of charters of Boards of Control likewise appears, is identical, and an exact copy of section 3 of the charter of Boards of Control above quoted. It is not necessary, therefore, for purposes of comparison, to copy section 3 of the warehouse charter in this opinion. This section sets forth the purpose of the County Boards of Control, and the warehouses to be erected in the necessary conduct of the business; and, if one Board of Control has the right to prevent a sale by its disapproval, one warehouse has the same right; so that one warehouse or one Board of Control might disapprove, and thereby disarrange the entire pooling arrangement. So far, therefore, as may be gathered from the charter of the Board of Control, it would have the same and no more right to be consulted in the sales of the tobacco by the Burley Tobacco Society than the warehouse companies; and it is nowhere contended that the warehouse companies have any such right.

It will be noticed, however, under section 3 of the charter of the Boards of Control above quoted, that while they are to co-operate with the Society, and assist the growers in securing remunerative prices, and are to act as agents in having the tobacco disposed of, so as to promote the best interests of the persons whose tobacco may be placed in their charge, still the purpose is that the tobacco shall finally be sold for the growers by the Society, and the tobacco is to be placed under the control of the Burley Tobacco Society for sale. In other words, the purpose of the Board of Control is that of co-operation within its field of operations, which is principally the arranging for the warehousing and handling of the tobacco, contemplating, however, a final sale thereof to be made by the Burley Tobacco Society, and by no one else. The terms of the contract above set forth are in entire accord with these provisions of the charter and by-laws, since the contract expressly provides for ''selling all of the said tobacco in such manner and on such terms as said Burley Tobacco Society may prescribe pursuant to its charter and by-laws.''

It is an elementary rule of law that a contract ought

to receive that construction which will best effectuate the intention of the parties, to be collected, not from detached parts thereof, but from the whole contract.

In Hunter's Admr. v. Miller's Ex'rs., 6 B. M., 619, we said:

"The only legitimate object of all rules of interpretation and construction, is to ascertain and effectuate the intention of the parties. When that is apparent, the words must, if possible, be so understood as to give effect to the intention."

Greater regard is to be had to the clear intent of the parties than to any particular words which they may have used in the expression of their interest. Ford v. Beach, 11 Q. B., 866.

In Roberts v. Bonaparte, 73 Md., 191, 10 L. R. A., 691, the Maryland Court of Appeals, said:

"It is, moreover, a familiar principle that courts, in the construction of contracts, look to the language employed, the subject matter and the surrounding circumstances. They are never shut out from the same light which the parties enjoyed when the contract was executed, and in that view they are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, so as to judge of the meaning of the words, and the correct application of the language to the things described. Nash v. Towne, 72 U. S. (5 Wall.), 699."

We think it plain, therefore, beyond a doubt, that under the pooling contract of 1909 the sale of the tobacco is solely within the control of the Burley Tobacco Society, acting under its charter and by-laws. To hold otherwise, would completely ignore the concluding clause which provides for the "selling of all the said tobacco in such manner and on such terms as said Burley Tobacco Society may prescribe pursuant to its charter and by-laws." It would be an unusual contract that confided this paramount power of the pooling arrangement to one general central body composed of delegates from the sixty-four component bodies, with a veto power upon a sale resting in any one of sixty-four different and subordinate bodies. Such a contract would not only be an anomaly, but it would completely nullify the entire pooling scheme. To give such a meaning to the contract would do violence to the very terms in which it is expressed.

We are, therefore, of opinion that the circuit judge was in error in holding that the Pendleton County Board

of Control had a voice in the sale of the tobacco of appellees.

2. Has the Burley Tobacco Society under the 1909 pooling contract, and its charter and by-laws, the right to equalize the poolers of different counties, so that in a final distribution each pooler will receive the same general price on like grades of tobacco, notwithstanding the sales were made at different prices?

As above pointed out, section 12 of the by-laws of the Burley Tobacco Society provides that said Society shall make all contracts for the sale and other disposition of the tobacco, "and shall distribute the proceeds of all the sales among the persons legally entitled thereto." The pooling contracts for 1906 and for 1907 provided that the tobacco should not be sold for less than an average price of fifteen cents per pound. The tobacco in the 1906 pool was sold at an average of fifteen cents per pound, and all of the 1907 pool was sold at the flat price of seventeen cents per pound. But when it came to draw the pooling contract for the 1909 crop, no minimum price was fixed, but in lieu thereof the contract provided that said tobacco should not be sold below the general price fixed by the Burley Tobacco Society on like grades of tobacco. The Burley Tobacco Society was unable, however, to sell the 1909 crop in the same manner that the 1906 and 1907 crops had been sold, at prices fixed beforehand by the Society, but by reason of the necessities of the times it was compelled to place the 1909 crop on the open market for sale by the hogshead, from day to day, and extending from the Fall of 1910 until the Spring of 1911. In this way the Society at the institution of this action, had sold 66,295,145 pounds of the crop of 1909 tobacco for $7,091,733.83, or at an average of $10.69 per hundred; and from the amounts thus realized it had made two distributions of twenty per cent each, the first on February 15, 1911, and the second on May 10, 1911. In these two distributions the Pendleton County poolers received $148,863.19, which was $77,571.80 in excess of the amounts then actually due them for that portion of their tobacco which had been sold up to that time. This result was obtained by treating the entire crop of the sixty-four counties in the pool as a single crop, and by giving to each county its proportionate share of the money from sales made up to that time, disregarding the fact whether any particular county's tobacco had been sold, or not. Having found that it was unable to sell the crop of 1909 as a

whole, the Executive Board of the Society adopted what it deemed the best possible plan of obtaining the largest aggregate price for the tobacco by selling portions of the crop from time to time, at prices which then seemed advantageous. Either this method had to be followed, or no sales could have been made in the meantime, although they might have been made advantageously. The differences in the prices thus realized were due to the fluctuation of the market, and not to the difference in the quality of the tobacco. Like grades of tobacco throughout the district are of uniform value, but the price at which any grade could be sold varied from day to day, as in the cases of all commodities offered for sale in the open market. As an illustration, we have in the record two contracts made subsequent to the bringing of this suit, one with Bagley & Co., calling for thirty-two hogsheads at the price of $11.75 per hundred pounds, and the other with Kirk, calling for a similar grade of tobacco at the price of $16.50 per hundred pounds. In these two instances the sales were undoubtedly made in the manner originally contemplated by the contract, since they were made at general prices, on those grades, and fixed by the Society before the sale was made. If all the tobacco of a given grade had been sold at a uniform price, each grower would, of course, get exactly the same price for his tobacco in the distribution; but, as this method could not be carried out, the Society, without any objection from any county, sold on the open market for the best price it could obtain, and at a price which it considered advantageous to the members of the pool. The result necessarily required some method of equalization, if the pool was to be maintained in its integrity. Under the pools of 1906 and 1907, there was no necessity for equalizing one county with another, since the entire crop was sold as a whole, at a uniform price, and the method of sale necessarily made everybody equal.

Clearly, the pooling plan did not contemplate a sale of the tobacco of Pendleton County as an independent lot; for, if it did, the elaborate machinery provided in the Burley Society's charter and by-laws was not only wholly useless, but extravagantly so. On the contrary it is manifest the purpose was to pool the burley tobacco of the entire burley district, and to sell it as an entirety. The very term "pool" means a surrender of certain individual rights and powers to the common holder for

the benefit of all, upon the theory that the accruing benefits gained by the joint venture outweigh the individual rights surrendered. The burley tobacco growers felt they were helpless against the combined strength of the great buyers of tobacco, and to protect themselves the pool was created. The keynote of the organization was practical and effective co-operation throughout the entire burley tobacco district. There had been no pool in 1908, and it is but reasonable to believe that in view of the successful pools of 1906 and 1907, the value and usefulness of a pool had been emphasized by its absence in 1908. The large buyers, commonly known as the "Tobacco Trust," refused to deal with the Society for the 1909 crop on a basis of prices that would pay the growers. Under the circumstances, something had to be done if the pool was to live; and, in adopting the plan of making sales from time to time, at prices that were acceptable, if not entirely satisfactory, and equalizing the price of the entire crop by treating the aggregate of the sums received under the several sales as the price of a single sale, the Society adopted perhaps the only plan that could have saved the pool and made it effective along the lines for which it was originally created.

It is contended, however, that the 1909 pooling contract provides that the tobacco shall not be sold below the general price fixed by the Society, and that this method of fixing a general price by equalization after the sales have been made, does not meet the requirements of the contract. We can not concur in this criticism. The contract of 1909 does not require that the general price shall be fixed by the Society in advance of the sale, as did the contracts of 1906 and 1907; it merely provides that the general price for which the tobacco may be sold shall be fixed by the Burley Tobacco Society, and under the terms of the contract it might have made a sale for a general price fixed in advance of the sale, or it might have made several sales and have fixed a general price for all of them by combining the proceeds and fixing a general average. The wisdom of the plan adopted by the Society can be easily seen from an illustration. Prior to the bringing of this suit the Society had sold over sixty-six millions of pounds of burley tobacco of the 1909 pool at a general average of $10.69 per hundred pounds. These sales included 1,129,-545 pounds pooled by the growers of Pendleton County, which sold for an average of $10.69 per hundred pounds, precisely the same price that was realized upon all the

sales, when treated as one sale. The Pendleton County growers are therefore in no position to complain of the sales made up to the time this suit was instituted. The Boone County growers, however, had 1,218,055 pounds in these sales, or 88,510 pounds more than the Pendleton County growers had therein; but the Boone County to-bacco brought an average of $11.95 per hundred, thus putting into the pool $145,553.03. If, however, the Boone County tobacco had sold for only $10.69 per hundred, the price brought by the Pendleton County tobacco, it would have put into the pool only $130,210.07. In other words, by reason of the higher price obtained for the Boone County tobacco over the Pendleton County tobacco the pool was benefited to the extent of $15,342.96. The tobacco of twenty-one counties out of the sixty-four counties in the pool sold for a price exceeding $10.69 per hundred, the price realized from the Pendleton County tobacco. It would seem, therefore, that the only practical method, under the circumstances, of carrying out the provisions of the contract which required a fixing of the same price on like grades of tobacco, was followed by the equalization plan adopted by the Society. It was within the terms of the contract, and accomplished the purpose for which the pool was created. Under the construction of the contract contended for by appellees, the pool must necessarily go out of existence; it could not possibly survive such an interpretation. On the contrary, the contract, the charter and by-laws of the Burley Tobacco Society, and the charter of the County Board of Control, all look to the accomplishment of the result which has been obtained under the construction given the contract by the appellant.

In this connection it is proper to say that the equalization should not only relate to the price, but also to the expense, so that each county should be charged with a like proportion of the expense of carriage under this method of distribution, in order that complete equality may be obtained among all the poolers.

The judgment of the circuit court is reversed, with instructions to set aside the order of injunction, and dismiss the petition and the cross-petition.