### Kirkpatrick, et al. v. Lebus.

(Decided May 2, 1919.)

### Appeal from Montgomery Circuit Court.

1. Bills and Notes—Performance of Obligation—Negotiable Instruments.—A party to a negotiable instrument has the right to insist as a condition precedent to his performing any part of its obligation before maturity that the instrument be presented by the one insisting upon the performance.

2. Bills and Notes—Designation by Statute as to Negotiability.—It is competent for the legislature by statute to designate what contracts may be negotiable and to confer upon them the qualities

of commercial paper, provided such a statute is not in conflict with any constitutional provision.

3. Warehousemen—Warehouse Receipts—Negotiable Instruments.— Section 4814a of Kentucky Statutes authorizes the issual of warehouse receipts by those engaged in warehousing tobacco to the one delivering tobacco to it, which receipts subsection 3 of the section, supra, declares shall be negotiable, possessing the characteristics of bills of exchange and with like remedy thereon, and when so issued they possess such qualities although they may be essentially different from negotiable instruments under the law merchant or negotiable instruments act.

4. Warehousemen—Warehouse Receipts.—When a tobacco warehouse company issues such a receipt it has the right to require the presentation of the receipt before performing any of the obligations contained therein, and where one of such obligations is to issue a designated amount of stock in the company to the holder, it can not be required to issue the stock except upon presentation of the receipt.

5. Contracts—Performance.—When no time is fixed for the performance of a contract or some condition precedent thereto, the law requires that performance shall be made within a reasonable time after the execution of the contract, or after the precedent condition can be performed.

6. Contracts—Performance.—What is a reasonable time within this provision of the law of contracts depends upon the facts and circumstances of each case, and where the facts are undisputed it is a question of law for the court.

7. Warehousemen—Warehouse Receipts—Negotiable Instruments.— Where one is entitled to stock to be issued pursuant to provisions contained in a negotiable warehouse receipt, it is his duty to procure or have his agent to procure the warehouse receipts entitling him to the stock and present them to the company before he can demand the issue of the stock, and if he has sold the stock, it is his duty to perform such precedent conditions before he can demand of his purchaser performance of the contract on his part; and when no time is fixed in the contract of sale for the delivery of the stock, such precedent conditions must be performed by the seller within a reasonable time after the company is in condition to issue the stock.

8. Warehousemen—Warehouse Receipts—Issuance of Stock.—A delay on the part of the seller to perform such precedent conditions and to obtain the stock agreed to be sold for a period of ten months after he was entitled to have the stock issued is an unreasonable time, and the purchaser will not be compelled to perform his part of the contract.

9. Warehousemen—Sale of Stock—Warehouse Receipt.—Plaintiff sold defendant stock in the Burley Tobacco Company, there being no time fixed for the delivery of the stock. Plaintiff was entitled to have it issued on presentation of the warehouse receipts containing the agreement to issue it but he failed to do so from

June until the next May. Held, that his unreasonable delay in procuring the stock justified the defendant in declining to accept it.

ROBERT W. WINN, W. B. WHITE and LEWIS APPERSON for appellants.

EDWARD C. O'REAR and HENRY R. PREWITT for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

Appellants and plaintiffs below, M. L. Kirkpatrick and J. W. Glover, for the use and benefit of Kirkpatrick, filed this suit against defendant and appellee, Clarence Lebus, seeking the specific performance of an oral contract which the parties entered into on the 12th day of June, 1912, whereby plaintiffs agreed to sell to defendant and he agreed to buy ten thousand shares of the stock of the Burley Tobacco Company, the par value of which was one dollar per share, and for which defendant agreed to pay upon delivery of the stock to him the sum of $9,000.00. At the time the contract was entered into there had been no stock issued by the Burley Tobacco Company (hereinafter referred to as the company), but it is alleged in the petition that plaintiffs procured the stock on May 14, 1914, and two days thereafter tendered it to the defendant with a demand of the payment of the agreed price, and that he declined to either accept the stock or pay any part of the price. It is alleged that the stock at that time was practically worthless, and that suit for damages for failure to comply with the contract would not furnish adequate remedy, since it could not be shown what, if anything, was the market value of the stock at the time defendant declined to perform the contract. The suit therefore sought to compel defendant to accept the stock and pay the contract price. No serious objection is made to the form of the action, and no discussion will therefore be made in this opinion of the propriety of the remedy adopted.

The answer denied the terms of the contract declared on, but admitted that there was a contract entered into of the nature claimed by plaintiffs, insisting that it contained other terms than those set out in the petition. Other denials were made, and in a second paragraph of the answer it is alleged that under the terms of the contract plaintiffs were to procure the issual of the stock to them by the company as soon as it could under the law

and facts issue it, and that it was their duty to make delivery thereof to defendant within a reasonable time thereafter, all of which plaintiffs failed to do and did not tender or offer to tender the stock for more than two years after the date of the contract, and that defendant was, therefore, relieved of the obligation to take and pay for it. It was further alleged in the answer that on September 30, 1913, which was after the expiration of a reasonable time when plaintiffs could have procured the issual of the stock, defendant tendered to plaintiffs $9,000.00 in gold coin and demanded the delivery of the stock, which was refused by plaintiffs upon the ground that no stock had been issued to them and they were unable to make delivery. Appropriate pleadings made the issues and after the taking of a large volume of testimony the cause was submitted, resulting in a dismissal of the petition, and to reverse that judgment plaintiffs prosecute this appeal.

There is much irrelevant matter contained in the evidence, and many collateral issues of fact of the same nature are presented and discussed, as well as a number of issues of law of the same character, but since we have concluded that the rights of the parties are to be determined upon a correct solution of the matters subsequently noticed, many of the irrelevant issues of both law and fact discussed in briefs will receive no further mention by us.

The facts bearing upon the issues involved and necessary for the determination of this suit are that prior to 1909 there existed throughout the counties of Central Kentucky and adjacent territory wherein burley tobacco was produced, a voluntary association known as the Burley Tobacco Society (hereinafter referred to as the society) the members of which were the producers of that variety of tobacco. There had also been organized an independent concern called the Burley Tobacco Company, the chief object and purpose of which was to establish and operate tobacco warehouses in the various counties where the tobacco was grown, and to receive from the producers their tobacco and store it in the various warehouses, and to hold it until such a time as the society saw proper to sell it or until the owner (called in this record the pooler) should call for it, when he would be delivered a like amount of the same grade he had pooled with the society and which he had deliv-

ered into the warehouses of the company. The company was also to sell the tobacco at the request of the pooler or the society and it was allowed to make certain charges for making the sales and other warehouse expenses, including insurance, but the pooler of the tobacco agreed upon delivery thereof to the warehouses of the company to subscribe for and take stock in the company to the amount of ten per cent. of the gross proceeds of his tobacco when sold. Upon the delivery by the pooler of his tobacco to the warehouse, there was issued and delivered to him by the company a warehouse receipt (hereinafter called receipt) which, omitting signature and other unnecessary parts, reads:

"This is to certify that......................................................has this day delivered to the Burley Tobacco Company (incorporated)....................pounds of tobacco as described on the back of this receipt, which tobacco is pledged under the 1909 pooling contract to the Burley Tobacco Society, and in accordance with said pledge is held by it, subject to the natural shrinkage and it to be commingled, handled, stored, cared for and delivered. The tobacco described in this receipt was received under the supervision of the Burley Tobacco Society, and has been appraised at $........... dollars on a twelve (12) cent basis to fix the proportional interest of the holder in the commingled tobacco of this county.

"It is agreed by the holder of this receipt that under the 1909 pooling contract, which the holder now adopts and ratifies, 10% of the gross proceeds of the tobacco represented by this receipt will be invested by the Burley Tobacco Society in the stock of this company.

"This company agrees to deliver this tobacco commingled or pay its sale value, less all charges, payable in proportion as sales are made to the Burley Tobacco Society or its order for the benefit of the holder of this receipt, according to the conditions and terms of the pooling contract of 1909.

"This warehouse receipt is issued under the Statutes of Kentucky and is assigned (assignable) and negotiable, subject to its provisions, but the company will not recognize any assignment until it has received written notice thereof."

This receipt was issued pursuant to the provisions of subsection 1 of section 4814a of the Kentucky Statutes, which was an act of the legislature passed at its 1910 ses-

sion. There had been statutory provisions in Kentucky for the issuing of warehouse receipts since 1869, when the first statute upon the subject was passed, but neither it nor its various amendments specifically provided for the warehousing of tobacco and the issual of receipts therefor, although the terms of prior statutes may have been broad enough to include the warehousing of that product and the issuing of receipts therefor.

Subsection 3 of the section referred to in part says: "All warehouse receipts so issued by any corporation, company, partnership or individual, engaged in the business as above set forth (tobacco warehousemen) shall be negotiable and transferable by endorsement in blank or by special endorsement and with like liability as bills of exchange now are and with like remedy thereon."

There were but three witnesses who testified concerning the terms of the contract sued on, and but two of them said anything about the time when under the agreement the stock involved should be issued by the company and delivered to defendant and the contract consummated, they being the plaintiff Glover and the defendant. Upon this point their testimony is slightly different. Glover says that the stock was to be delivered and paid for when it was issued by the company, while defendant says that it was "to be paid for as soon as the warehouse receipts are produced and the company can issue same." But, as will be seen, the difference in the testimony upon this point is immaterial. The contract, according to both witnesses, contemplated the delivery of the stock as soon as the company under the law and the terms of the receipt could safely issue it, and the chief as well as decisive question in the case is, when could it do that?

It is the contention of plaintiffs that the company could have issued, with safety to itself and in full compliance with the terms of the receipt, the stock at any time after the contract sought to be enforced was entered into; while defendant insists that it had no right to issue any stock except upon presentation of the warehouse receipt, since it, under the law, is a negotiable instrument and none of its obligations could be discharged so as to relieve the company except to a holder thereof, and to protect the company as well as the holder the former was justified in declining to issue any stock except on presentation of the receipts.

Further, that it could not even do that until all of the tobacco was sold, for not until then could it be known what would be the ten per cent. of the gross sales which the pooler had agreed to invest in stock, and that this was not done until somewhere near the first of June, 1913, when it was ready to issue the stock on presentation of the receipts and plaintiffs were notified of that fact, but failed to procure the receipts or to present them and demand the issual of the stock until May, 1914, which was an unreasonable delay.

The contracts with the holders of the receipts or the poolers of the tobacco, under which plaintiffs purchased the right to have issued to them the stock called for by the receipts, consisted of writings or transfers wholly independent of the receipts, with no endorsement upon the latter of any such contracts. These independent contracts were filed with the company and a record thereof made in its office. It is therefore insisted by plaintiffs that it was the duty of the company to issue to the society for the use and benefit of the holder of the receipt his proportionate part of stock immediately upon the sale of the first ten per cent. of his tobacco, and that since the society and the company were composed of practically the same individuals and had the same officers, the latter, as officers of the society, could have demanded of themselves as officers of the company, the issual of the stock as soon as ten per cent of the tobacco was sold, and that such transaction under the terms of the receipt would have fully protected the company because the society was in reality the promisee therein.

It is further insisted that if they are mistaken in such contention, then the warehouse receipts are not negotiable instruments and it was not necessary for the protection of the company that they be presented before any stock was issued.

Before considering either of these propositions it might be well enough to say that plaintiff Glover (without presenting the receipts) demanded of the company on several occasions before June, 1913, that it issue to him the stock called for by his contracts with the poolers, which we have seen had been filed with the company, but the attorneys for the latter advised it not to issue the stock when the first demand was made, because at that time there was pending in the Kenton circuit court a suit, the object and purpose of

which was to declare the officers of the company usurpers and to have their acts adjudged to be *ultra vires*. In that suit it was also sought to have a receiver appointed for the company and to wind up its affairs, &c. Under such conditions plaintiffs' attorneys, in addition to insisting upon the negotiability of the warehouse receipts, advised the company not to issue any stock until the determination of that suit, which occurred about June 1, 1913, at which time notice was given to plaintiffs and the public generally that the company was prepared, upon presentation of the receipts, to issue the stock called for therein. Manifestly, if the warehouse receipts are negotiable instruments, the company was fully authorized to decline to perform any of the obligations which they imposed upon it, unless the receipts were presented and the performance of the stock obligation be endorsed thereon.

Whether a written promise is a negotiable instrument having the qualities of commercial paper is a matter to be determined by the fiat of the law to be established either by a universal custom of the commercial world or by statutory enactment. The law, before the enactment of any statute upon the subject, was that which originated under long established custom and usage, and constitutes that branch of the law known as the law merchant, but it is competent for the law-making power of any state or country, by statute, to regulate the making, construction, validity, formalities and authentication of contracts which are entered into or to be performed within its territory, and within such powers is included the one to enlarge or diminish the character of paper which is negotiable, and to add to or deprive it of "the characteristics and qualities which distinguish it from other contracts," and which render it either negotiable or not negotiable. 3 R. C. L., page 847; 7 Cyc., page 541; Early Times Distilling Co. v. Earle, 21 Ky. 1709; Greenbaum v. McGibben, 10 Bush, 419, and Cochran & Fulton v. Ripy. 13 Bush, 495.

Under the law merchant a written promise to be negotiable must possess certain characteristics, among which is that the promise shall be only for the payment of money in a fixed sum at a definite time to the bearer or holder, and substantially the same requirements are made by the act known in this and other states as the Negotiable Instrument Act, but under the rule above referred to such requirements by both the law merchant

and the negotiable instrument acts, or any one or more of them, may be dispensed with by statute duly enacted by the law-making power, or it may make additional requirements to certain character of contracts in order for them to possess the qualities of negotiable paper, and when such statutes are enacted they effect a *pro tanto* amendment of the law pertaining to negotiable paper in that jurisdiction. Such is the effect of subsection 3 of section 4814a of the statutes, *supra,* as we construe it. Indeed there could be referred to a number of cases from this court holding that warehouse receipts for the storage of articles of produce other than tobacco and containing terms entirely different from ordinary commercial paper have been held to possess the same negotiable characteristics of such paper, and the rights of the holder of such receipts are the same as those of the holder of other instruments recognized as negotiable under the law merchant and the Negotiable Instruments Act. Among some of the cases so holding are Early Times Distilling Co. v. Earle, Greenbaum v. McGibben and Fulton v. Ripy, *supra.* We therefore conclude that the receipts issued by the company in the instant case possessed all the attributes of commercial paper with the right of the parties thereto fixed accordingly. Indeed the statute authorizing their issual not only expressly says that they shall be negotiable, but that they shall be issued and transferred "with like liability as bills of exchange now are, and with like remedy thereon." This being true, the company properly declined to issue any stock called for by the receipts until they were presented, and it was justified in declining to do so upon the demand of plaintiffs unaccompanied by such receipts.

Plaintiffs, however, seek to prevent this effect from being given the receipts by insisting that according to their terms the obligation to pay for the tobacco as sold and to issue the stock called for could be discharged by the company performing those duties at the request of the society acting as the agent or factor for the pooler to whom the receipt was issued, and that since the company and the society, although separate in law, were practically the same in fact, and that defendant being the president of and the dominant factor in both, it was his duty to procure the society to make demand of the company for the issual of the stock at any time after the tobacco represented by the receipt had been sold. In other words, it

is contended that the society is in reality the promisee in the receipt instead of the holder or pooler to whom it was issued, and we are cited to the case of Burley Tobacco Society v. Monroe, 148 Ky. 289, as so holding. But we do not construe the opinion in that case as plaintiffs contend for. That case, as we understand it, goes no further than to hold that under the terms of the receipt the society as agent and factor for the producer has conferred upon it the power and authority to make contracts for the sale and disposition of the pooled tobacco, and perhaps to collect the proceeds of sale and distribute them among the poolers. But the case does not hold that the society could collect the proceeds of any sale without producing the receipt, and this conforms to our interpretation of the language of the receipt. It, as we construe it, authorized the company to discharge the obligation of the contract embodied in the receipt to the society as agent of the pooler, but under the circumstances only when the pooler himself could demand performance. The terms of the receipt go no further than to authorize the company to deal with the society as the agent of the pooler or the holder of the receipt, and do not enlarge the authority of the society so as to dispense with any legal requirement that might be demanded of its principal.

We do not attach any importance to the contention that because the defendant was a stockholder and officer in both the society and the company that the duty devolved upon him to procure the former to make legal demand for the stock. While possibly he sustained such a relation as that he could have procured this to be done, he was under no legal obligations to do so. He had the right to require the plaintiffs to discharge all precedent conditions looking to a performance of their contract with him. Nor do we find any testimony in the record authorizing the insinuation that defendant in some fraudulent manner obstructed the issuing of the stock. On the contrary, the conditions upon which the stock was to be issued applied to all of the more than forty thousand poolers in the society. Those conditions were general in their nature, applying to all alike, and the testimony conclusively shows that they were imposed in furtherance of a policy of safety to the company and upon the advice of learned counsel, the latter of whom had no knowledge of the existence of the contract sued on.

So then the case is reduced to this single proposition —there being no fixed time in the contract when the stock should be issued by the company to the plaintiffs and delivered by them to the defendant, what time did plaintiffs have in which to procure the stock and carry out their contract? The law furnishes but one answer to the question, which is that in the absence of a specified time for the performance of a contract it must be performed within a reasonable time after its execution or after the conditions arise when performance can be made. This is a familiar doctrine of the law on contracts, requiring no fortification by adjudged cases or textwriters, but we append the following: 9 Cyc. 611-613; Phillips v. Morrison, 3 Bibb, 105; Hildreth v. Ayer & Lord Tie Co., 32 Ky. Rep. 1212; Ky. Chair Co. v. Commonwealth, 105 Ky. 455; Elliott on Contracts, sections 1613 and 1877. The rule is equally fundamental that what is a reasonable time is to be determined by the facts and circumstances of each case, and that where the facts are undisputed it is a question of law for the court. 9 Cyc. 613-614. All parties to this suit agree that after about June 1, 1913, all obstacles in the way of issuing stock by the company had been removed, and from that time on it was ready to issue the stock on presentation of the receipts. Plaintiffs possessed this information, but their efforts to procure the receipts entitling them to the stock demanded were confined to writing to some of the poolers who had transferred to them their right to the stock. From the date last mentioned to September 30 following (when defendant made tender of the price) was a period of about four months, but it is not essential for the determination of this case to find whether under the circumstances that was a reasonable time within which the plaintiffs should have performed the conditions precedent to an enforcement of the contract, since such conditions were not performed until about the middle of May, 1914, nearly eight months after the tender by defendant, and practically one year after all obstacles to the issuing of the stock had been removed. We have no hesitancy in holding that such a delayed performance by plaintiffs of the precedent conditions was beyond the limitations of what is included by the phrase "a reasonable time." This being true, defendant was not compelled to take and pay for the

stock at the time it was tendered, and the court was correct in declining to compel him to do so and in dismissing plaintiffs' petition filed for that purpose.

The judgment is therefore affirmed.