LIGGETT GROUP, INC.; Vector Tobacco, Inc.; Commonwealth Brands, Inc.; King Maker Marketing, Inc.; and Sherman's 1400 Broadway N.Y.C., Ltd., Appellants,

v.

COMMONWEALTH of Kentucky and Vibo Corporation, d/b/a General Tobacco, Appellees.

No. 2006–CA–000359–MR.

Court of Appeals of Kentucky.

Aug. 24, 2007.

William E. Johnson, J. Guthrie True, Frankfort, KY, for appellants, Liggett Group, Inc., and Vector Tobacco, Inc.

K. Gregory Haynes, Virginia Hamilton Snell, Louisville, KY, for appellants, Commonwealth Brands, Inc.; King Maker Marketing, Inc.; and Sherman's 1400 Broadway N.Y.C., Ltd.

Elizabeth B. McCallum, Washington, D.C., for appellants, Liggett Group, Inc.; Commonwealth Brands, Inc.; King Maker Marketing, Inc.; and Sherman's 1400 Broadway, N.Y.C., Ltd.

Gregory D. Stumbo, Attorney General of Kentucky, Michael L. Plumley, James M. Herrick, Assistant Attorneys General Frankfort, KY, Peter J. Levin, National Association of Attorneys General, Washington, D.C., for Appellee, Commonwealth of Kentucky.

Steven S. Reed, Kent Wicker, John K. Bush, Louisville, KY, for appellee, Vibo Corporation, d/b/a General Tobacco.

Before THOMPSON and WINE,

Judges; KNOPF,[1] Senior Judge.

## OPINION

WINE, Judge.

The Appellants, Liggett Group, Inc., Vector Tobacco, Inc., Commonwealth Brands, Inc., King Maker Marketing, Inc., and Sherman's 1400 Broadway N.Y.C., Ltd. (collectively, "the Appellants"), appeal from a January 26, 2006 order of the Franklin Circuit Court denying their motion to enforce the terms of the Master Settlement Agreement ("MSA") entered into between a majority of states, including Kentucky ("the Settling States"), and the tobacco manufacturers. The Appellants contend that a 2004 agreement allowing Vibo Corporation, d/b/a General Tobacco (and its affiliates Trademark Holding Corporation and Sun Tobacco, Inc.) (collectively "GT"), to join the MSA violated the terms of the MSA. The Appellants argue that they are entitled either to set aside the agreement between the Settling States and GT, or to be given terms relatively as favorable as those afforded to GT. We disagree with the Appellants that the Settling States improperly allowed GT to finance its back payment over a twelve-year period and that the MSA required GT to include all of its 2004 sales in the calculation of its 2005 payment. We further conclude that, since the Appellants are not affected by the terms of the GT Agreement, they are not entitled to set aside the GT Agreement, to withhold their consent to it, or to receive "Most Favored Nation" treatment under the MSA. Hence, we affirm the circuit court's order granting summary judgment to the Commonwealth and GT.

The circuit court set out the undisputed facts of this action as follows:

In 1998, the Attorneys General of forty-six states, the District of Columbia, the Commonwealth of Puerto Rico and four territories, ("the Settling States") entered into the MSA with the four[2] major domestic cigarette manufacturers, (the Original Participating Manufacturers, "OPMs"). This agreement was intended to help control the public health risk caused by tobacco products by placing conduct restrictions on the signatory companies, such as ending youth targeting advertising campaigns. Under the agreement, signatory companies are obligated to make a yearly payment, directly related to their market share of the cigarette industry, to the Settling States in an attempt to offset the Medicaid and other costs associated with tobacco related diseases. In exchange for these regular payments, the signatory companies are given a release of claims from the Settling States.

Under the terms of the MSA, companies other than the original four may join the agreement. These companies are referred to as Subsequent Participating Manufacturers ("SPMs"). These SPMs are also obligated to make payments and are required to follow the same conduct restrictions as the OPMs. The [Appellants] are all part of a special category of SPMs who joined the MSA within ninety (90) days of its entry. These companies are referred to as "grandfathered SPMs" because they are not required to make any MSA pay-

---

1. Senior Judge William L. Knopf sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

2. These were originally Lorillard, Phillip (sic) Morris, RJR American and Brown & Williamson[;] however Brown & Williamson has since been acquired by RJR American bringing the number of OPMs to three. [Footnote in original].

ments for current sales that fall below their 1997 sales volume.

On August 19, 2004, the Commonwealth, as part of the National Association of Attorneys General, ("NAAG"), reached an agreement with General Tobacco, ("The General Tobacco Adherence Agreement," "GT Agreement"), which allowed GT to join the MSA....

The Appellants brought this action challenging the GT Agreement, arguing that the terms of this agreement provided for "financial terms uniquely advantageous" to GT in violation of the MSA. In particular, they raise three issues regarding the GT Agreement. First, the Appellants argue that the twelve-year repayment period for GT to make its back payments is not a reasonable period of time. Along similar lines, they assert that the interest rate applied to these back payments violates the MSA. Second, they contend that GT's payment for 2004 should be based on its entire year's sales rather than only those sales after July 1. And third, the Appellants assert that the MSA requires consent of all parties for approval of the terms given to GT. For these reasons, the Appellants state that the GT Agreement must be set aside. In the alternative, the Appellants contend that they are entitled to "Most Favored Nation" status under the MSA; that is, they are entitled to receive terms as "relatively favorable" as those afforded to GT.

The circuit court rejected all of these arguments. First, the circuit court found that the twelve-year repayment period is reasonable based upon GT's assets, sales, and the size of its back payments. The court also found that the conditions at-tached to the repayment terms ameliorate any benefit GT may receive from the extended payment period. In addition, the court ruled that the interest rate on the back payments was authorized by the MSA. Second, the circuit court determined that the MSA allows the first year's payment to be based upon sales for only part of the year, provided that the remainder of the year's sales are included in the back payment. And third, the court found that the terms given to GT do not require consent of all parties to the MSA. The court further determined that the "Most Favored Nation" provision of the MSA is not implicated because the terms given to GT are not more favorable than the Appellants' terms. This appeal followed.

■ For the most part, the Appellants raise the same issues which they presented to the circuit court.[3] But since the MSA is a contract between the Settling States and the Participating Manufacturers, we review these matters *de novo* and without deference to the circuit court's conclusions. *Frear v. P.T.A. Industries, Inc.*, 103 S.W.3d 99, 105 (Ky.2003). The guidelines this Court must follow in interpreting this or any other contract are well known. "In the absence of ambiguity a written instrument will be enforced strictly according to its terms." *O'Bryan v. Massey–Ferguson, Inc.*, 413 S.W.2d 891, 893 (Ky.1966). Since none of the parties contend that the MSA is ambiguous, this Court will interpret the contract's terms by assigning language to its ordinary meaning and without resort to extrinsic evidence. *Hoheimer v. Hoheimer*, 30 S.W.3d 176, 178 (Ky.2000).

The Appellants first contend that the twelve-year repayment period exceeds "a

**3.** In the proceedings before the circuit court, the Appellants also argued that GT was offered credits against its future payment obligations "for amounts that the statutory law of non-settling states may require it to pay."

The court found that this provision was appropriate due to the possibility that GT might be taxed twice on the same cigarettes. The Appellants do not raise this issue on appeal.

reasonable period of time" as allowed by the MSA. Some additional facts are necessary to fully address this issue. The MSA requires Participating Manufacturers to make annual payments to the Settling States based upon their annual sales and market share. However, the MSA also recognizes that non-Participating Manufacturers may gain an advantage over Participating Manufacturers due to these obligations. To offset these potential competitive advantages, the MSA requires the Settling States to enact and enforce escrow statutes.

Under these escrow statutes, non-Participating Manufacturers are required to make yearly deposits into escrow accounts in an amount approximately equal to those required of Participating Manufacturers. When a non-Participating Manufacturer seeks to join the MSA, it must pay the Settling States all amounts which it would have been obligated to make had it been a signatory as of the MSA execution date. MSA § II(jj). If the non-Participating Manufacturer has been making escrow payments as required, then its escrow accounts should be sufficient to meet this obligation. But where the escrow balance is not sufficient to meet the obligation, the MSA allows a new SPM to make the balance of its back payment, plus interest, "within a reasonable period of time." MSA § II(jj).

In this case, the parties agree that GT's escrow balance is insufficient to meet its back payment obligation. GT's total back payment obligation was calculated at approximately $321,000,000.00.[4] Upon joining the MSA, GT paid more than

$78,000,000.00 from its escrow accounts, leaving a balance of approximately $243,000,000.00.[5] Under the GT Agreement, GT must pay this latter amount in annual installments over twelve years, beginning August 30, 2005. The GT Agreement further provides for five percent interest on the back payment. In addition, GT must place its upcoming year's anticipated payments into escrow in three quarterly payments. The breach of any quarterly payment obligation accelerates the entire balance due. To further guarantee its payments, GT was required to give the Settling States a security interest in its brand names.

■■■ The Appellants argue that the circuit court applied a subjective standard to determine what constitutes a "reasonable period of time" for a new SPM to make its back payments. However, the MSA does not define this term, nor does it set out any guidelines to determine what constitutes a "reasonable period of time." When a contract does not fix a time for performance of the contract or of any act or duty of the parties to it, there is no fixed rule to determine what constitutes a reasonable period. *Carhartt Holding Co. v. Mitchell,* 261 Ky. 297, 87 S.W.2d 360, 362 (1935). Rather, what is a reasonable time is to be determined by the facts and circumstances of each case. *Id.See also Kirkpatrick v. Lebus,* 184 Ky. 139, 211 S.W. 572, 576 (1919). Ultimately, a court must make a subjective determination of what constitutes a reasonable period.

In this case, the circuit court properly looked to the underlying purposes of the MSA, noting that "[t]wo of the most prom-

---

**4.** This amount includes approximately $233,000,000.00 due from GT based on its sales from 2000 through 2003, and approximately $88,000,000.00 due from its sales for the first half of 2004.

**5.** GT was able to accumulate this deficiency due to a loophole that existed in some state's escrow laws. In addition, prior to 2004 there was an ongoing dispute about whether GT was a manufacturer required to make escrow payments.

inent goals of the MSA are to join as many tobacco companies as possible in order to restrict their conduct and to provide a fund to the Settling States in order to offset the health costs of tobacco products." Thus, the court concluded that the term "reasonable period of time" should be interpreted broadly to encourage non-Participating Manufacturers to join the MSA. And based upon the evidence provided by the Settling States, the circuit court found the twelve-year repayment period is the shortest possible time in which GT can make its back payment obligation considering its assets, sales, and the size of its back payments. The court also found that the conditions attached to the repayment terms ameliorate any benefit GT may receive from the extended payment period. The Appellants do not take issue with any of these findings.

Under the circumstances, the twelve-year repayment period allowed to GT would seem to be at the outer edge of what could be considered a "reasonable period of time." But even if we were to apply an objective standard to determine reasonableness, the Appellants do not suggest any objective guidelines to make that determination. Likewise, the Appellants do not present any facts which would tend to show that the re-payment period is objectively unreasonable. Therefore, we cannot say that the trial court clearly erred in finding that the twelve-year repayment period given to GT is reasonable.

■ Along similar lines, the Appellants contend that the interest rate applied to back payments under the GT Agreement violates the terms of the MSA. The Appellants point to MSA § IX(h), which provides that interest on late payments

accrues at the Prime Rate plus three percentage points. However, GT's back payments are not overdue because the MSA expressly allows newly-joining Participating Manufacturers to make such payments within a reasonable period of time. Rather, we agree with the circuit court that this matter is governed by MSA § II(jj), which does not provide for a specific interest rate on back payments. Because the Appellants have not shown that the five percent interest rate applied to GT's timely back payments is unreasonable, we cannot find that this interest rate violates the MSA.

■ Second, the Appellants argue that GT was given an exemption as to its cigarette sales for the first half of 2004. They refer to a number of MSA provisions which, when read together,[6] require all Participating Manufacturers make a yearly payment on April 15, based upon the total amount of cigarettes sold by the manufacturer during the previous year and upon that manufacturer's individual market share. But under the GT Agreement, GT's payment for 2004, which was due on April 15, 2005, was based only upon its sales from July 1 through December 31, 2004. GT's payment for its cigarette sales during the first half of 2004 was included in its back payment.

The matter in controversy is reasonably simple: MSA § II(jj) requires a newly-joining manufacturer to make "any payments ... that it would have been obligated to make in the intervening period had it been a signatory as of the MSA Execution Date." The Appellants contend that this language refers to payments which come due prior to the date GT joined the MSA. Thus, the Appellants assert that GT's

---

**6.** The circuit court identifies MSA § IX(i)(1) as imposing this requirement. Among other things, this section provides that annual payments from SPMs are "due on the same dates

as the corresponding payments are due from Original Participating Manufacturers." The OPMs' payments are due on April 15 of each year. MSA § IX(c).

April 15, 2005 payment must be based upon its sales for all of 2004, regardless of when it joined the MSA. The circuit court disagreed, holding that the language refers to obligations which accrued prior to the date GT joined the MSA. Thus, the circuit court concluded that GT's obligation for the first half of 2004 could be included in its back payment rather than its payment due on April 15, 2005.

Under either interpretation, GT remains obligated to pay the $88,000,000.00 due to the Settling States for its sales from January 1 to June 30, 2004. The only question is whether GT owed this amount as of April 15, 2005, or the Settling States may include the amount in GT's back payment. We conclude that the circuit court's interpretation is consistent with the letter and the spirit of the MSA.

We agree with the Appellants that an SPM's annual payment generally will be based upon a full year's sales.[7] However, the MSA does not address the situation where a SPM is admitted during the middle of a calendar year. Since the back payment and annual payment obligations are separate and distinct, the GT Agreement properly addressed how each obligation was to be calculated for 2004.

Under MSA § II(jj), GT was required to address its back payment obligation before it could be admitted as an SPM to the MSA. Upon admission to the MSA, GT incurred a separate obligation to make the annual payments required of all SPMs. And under the GT Agreement, GT was deemed to have joined the MSA as of July 1, 2004. GT's annual payment for 2004 could only be based upon its sales after the date of its admission. Consequently, its payment based upon its sales prior to the admission was properly included in its back payment obligation. Therefore, we find no basis for setting aside the GT Agreement.

■ We recognize that all SPMs annual payments are based in part on the manufacturers' market share. In turn, market share is based upon all manufacturers' sales during the entire prior calendar year. Thus, the exclusion of a portion of GT's 2004 sales conceivably could affect the calculation of the other SPMs' annual payments.

Since the GT Agreement could affect the calculation of their annual payments for 2004, the Appellants argue that the Settling States were required to obtain their consent to the GT Agreement.[8] However, the Appellants have put forth no evidence that the GT Agreement actually affected the calculation of all of the manufacturers' market shares. As a result, the Appellants cannot show the GT Agreement affects the obligations of any party to the

---

7. *See* MSA § IX(i)(2), which provides:

    The base amount due from a Subsequent Participating Manufacturer on any given date shall be determined by multiplying (A) the corresponding base amount due on the same date from all of the Original Participating Manufacturers ... by (B) the quotient produced by dividing (i) the result of (x) such Subsequent Participating Manufacturer's applicable Market Share (the applicable Market Share being that for the calendar year immediately preceding the year in which the payment in question is due) minus (y) the greater of (*1* ) its 1998 Market Share or (*2* ) 125 percent of its 1997 Market Share, by (ii) the aggregate Market Shares of the Original Participating Manufacturers (the applicable Market Shares being those for the calendar year immediately preceding the year in which the payment in question is due).

8. In pertinent part, MSA § XVIII(j) provides as follows:

    This Agreement may be amended by a written instrument executed by all Participating Manufacturers *affected by the amendment* and by all Settling States *affected by the amendment.* (Emphasis added).

MSA. Therefore, we agree with the circuit court that the GT Agreement does not implicate the consent clause of the MSA.

 Likewise, we agree with the circuit court that the Appellants are not entitled to claim "Most Favored Nation" treatment under MSA § XVIII(b)(4). The term "Most Favored Nation" status is borrowed from the field of international trade law, where it referred to trade agreements providing for the extension of terms to another party as favorable as those extended to the "Most Favored Nation" with which it may deal. *See Amoco Production Co. v. Stauffer Chemical Co. of Wyoming*, 612 P.2d 463, 468, n. 7 (Wyo.1980). Similarly, the "Most Favored Nation" clause in MSA § XVIII(b)(4), provides that:

> [i]f at any time any Settling State agrees to relieve, in any respect, any Participating Manufacturer's obligation to make payments as provided in this Agreement, then with respect to that Settling State, the terms of this Agreement shall be revised so that the other Participating Manufacturers receive terms as relatively favorable.

As previously noted, the GT Agreement does not "relieve" GT of any payment obligation. It merely sets out the effective date for GT's admission to the MSA and allocates GT's back payment and annual payment obligations for 2004 accordingly. And even if this could be considered as "relieving" GT of an obligation, the circuit court also recognized that any favorable terms of the GT Agreement are "inextricably intertwined" with the unfavorable conditions. In addition to its annual payment obligation, GT is also required to put the upcoming year's anticipated payment into escrow in three quarterly payments and to provide the Settling States with a security interest in its brand names.

Thus, any benefit which GT may receive by including a portion of its 2004 payment obligation as a back payment is offset by equally harsh terms to which the Appellants are not subject. Moreover, the Appellants have not identified exactly what competitive advantage that GT receives under the GT Agreement in relative comparison to their own positions under the MSA.[9] Consequently, we agree with the circuit court that the Appellants are not entitled to "Most Favored Nation" treatment under the MSA.

Accordingly, the opinion and order of the Franklin Circuit Court is affirmed.

ALL CONCUR.

---

**9.** As the Appellants correctly note, much of the back payment is attributable to GT's failure to properly make its escrow payments as a non-Participating Manufacturer. But at the same time, the deficiency is also attributable to loopholes in the former escrow statutes of the Settling States and GT's strategy of concentrating its sales in non-Settling States. We agree with the Appellants that this conduct likely allowed GT to obtain a competitive advantage over complying OPMs and SPMs. However, all of this conduct occurred before the execution of the GT Agreement. For purposes of the application of the "Most Favored Nation" Clause, the controlling question concerns what favorable terms are afforded to GT under the GT Agreement.